HEARD NOVEMBER TERM, 1873:

McKEOWN *vs.* CARROLL.

Where land was assigned, in 1869, as a homestead to the widow and children of the judgment debtor, the estate remaining therein was not subject to levy and sale by the Sheriff under execution against the judgment debtor.

Where land has been assigned as a homestead, the validity of the assignment cannot be impeached collaterally, as by an action by a subsequent purchaser at Sheriff's sale to stay waste. It can only be impeached by a direct proceeding.

One who purchases land at Sheriff's sale, subject to an assignment, previously made, of a homestead therein, cannot impeach the validity of the assignment.

BEFORE MACKEY, J., AT CHESTER, APRIL, 1873.

Action by Samuel McKeown, plaintiff, against John L. Carroll and Agnes Carroll, his wife, defendants.

The case was as follows :

The complaint, filed February 19th, 1873, was for an injunction to restrain the defendants from committing waste in certain lands alleged to belong to the plaintiff, of which defendants were in possession.

The land in question belonged, in his life-time, to one James Younge, against whom a judgment was obtained in 1859, for $2,073.39.

Margaret Younge, the widow of the deceased, claimed a homestead therein, and on October 25th, 1869, the same was assigned to her.   Margaret Younge departed this life in 1872, and the defendant, Agnes, her only child, a minor, who has intermarried with John L. Carroll, is now in the enjoyment of the homestead.   The remainder in said homestead lands—being the interest of James Younge in said land, after the expiration of the homestead—was levied upon by the Sheriff of Chester County, under an execution issuing upon the judgment referred to, and was sold on sales-day in January, 1872, and bought by the plaintiff, who, in his complaint, charged that the defendants were cutting valuable timber on the homestead lands, and removing it therefrom, to erect buildings in the village of Blackstock, where they resided, several miles distant from the homestead, besides committing other acts of waste.   Upon the complaint and affidavits an injunction was granted February 5th, 1873.   The answer of the defendants did not deny the acts of waste complained of, but claimed that, under the Constitution and laws of the State, an absolute title to said lands is vested in them, and that the plaintiff had no interest therein.

The defendants gave notice of a motion to dissolve the injunction and to dismiss the complaint; and upon this motion the cause came on to be heard on the fourth day of April, 1873, when the following order was made:

MACKEY, J.   On hearing the pleadings in this case, and the argument of counsel for plaintiff and defendants, on the motion of the latter to dissolve the injunction heretofore granted at the suit of the plaintiff, and to dismiss the complaint herein, it is, on motion of defendant's counsel, ordered that the injunction heretofore granted in this case, of date the 5th day of February, 1873, be vacated and dissolved; ordered, further, that the complaint of the plaintiff herein be dismissed; and that the defendants have judgment for their costs.

The plaintiff appealed.

*Brawley,* for appellant :

The question submitted to the Court in this case is, whether the homestead, allotted according to the laws of the State of force in October, 1869, is an estate in fee or a less estate.

The estate of the defendants in the homestead premises was not derived from the ancestor, James Younge, was not acquired by purchase, but was vested in Agnes Younge, now Carroll, by operation of law.   She, therefore, took and has only such estate as the law gave.

The homestead was assigned, or set off, in 1869.   The only law then of force was the Act of 1868, (General Statutes, 475.)   That Act provides that the homestead is " to be set off to said person ;" not to said person and his heirs.   There are no words directly or indirectly granting any estate of inheritance, and, without such words, only a life estate passes, under the familiar principles of law.

But, as if to avoid the very question here made, the Act goes on to provide what shall become of the estate of homestead on the death of the tenant.   " The estate, *or right* of homestead of the head of any family, shall continue for the benefit of his widow and minor children, and be held and enjoyed by them until the youngest child is 21 years of age, and until the marriage or death of the widow, *and be limited to that period.*"   (§ 5, Gen. Stat., 476.)

It is thus an estate for life in the tenant, and estate for life or widowhood in the tenant's widow, and an estate for years, not exceeding 21, in the children of the tenant.

On the construction of the Act there can be no question as to the quantity or quality of the estate.

But the defendants claim that the Constitution gives, or intended to give, an absolute estate, and that the Act of 1868 does not carry into effect that intention.

To this we reply: The meaning and intention of the Constitution can only be ascertained from the Constitution itself; and there is not a single word in it granting any absolute estate, or carrying the estate of homestead beyond the life of the tenant or head of the family. There are no words of inheritance, nor is the estate declared to be an estate in fee. The extent of the homestead is clearly left to legislative discretion, limited by the provision that it shall " not exceed the value of one thousand dollars." When desiring " to secure the full enjoyment " of the homestead, it does not extend that enjoyment beyond " the person entitled thereto, or to the head of any family." Neither the widow nor children are mentioned in the Constitution.

There cannot, therefore, be any well-founded objection to the Act, on the ground that it grants to the tenant a less estate than the Constitution intended; on the contrary, the Act extends the benefit of the homestead farther than the Constitution does. The utmost that could be contended, under the Constitution, is that it left the quantity of the estate doubtful, in which case it remained for the Legislature to define and fix the character of the estate, whether for years, for life, or in fee.

That the Act of 1868 did not grant an absolute estate, and that the proper department to extend the benefits of the homestead was the Legislature, is clearly shown (if anything additional is needed,) by the Act of 1872, amending the homestead law, the 4th Section of which, (15 Stat., 230,) vests the estate in the head of the family in fee simple.

If an absolute estate had already been granted this Act would have been unnecessary. That it was necessary establishes conclusively that an absolute estate had not previously been granted.

Every estate of homestead granted after the passage of that Act will undoubtedly be an estate in fee; but the Act of 1872 cannot have a retroactive effect, and, by relation, enlarge into a fee simple the estate for life vested under the former Act.

Even if such construction were possible, it cannot apply to this case. Prior to the passage of the Act of 1872 there was a remainder over after the termination of the estate of the widow and minor child. That remainder was levied on and sold, and purchased by plaintiff, as was expressly provided for in the Act of 1868, Section 5. No subsequent Act of the Legislature can divest the plaintiff of the property which he rightfully purchased, without impairing the obligation of the contract of sale; and, therefore, it cannot be done at all.

Even where retrospective laws are permitted, they are never allowed to divest rights acquired prior to their enactment. "Subseqent *bona fide* purchasers cannot be divested of the property which they have acquired by a retrospective Act, changing the legal position of their grantor in regard to the thing purchased." (Cooley, Con. Lim., p. 378.)

It may be said that the homestead is an exemption from levy and sale, etc., and \that the party retains what is exempted in the same right and estate that he had before. But this exemption may be upon terms and conditions; and in our exemption Act of 1868, and in those of other States, the head of the family does not acquire the estate in fee simple, to dispose of it as he thinks proper. If he could turn round and dispose of it forthwith, the very policy of the law would be frustrated. It is, therefore, generally secured, after the party's death, to his widow and children.

This proves that he has not, and could not be intended to have, a fee simple absolute. The very policy of the law suggests and requires that the estate reserved or exempted should be subject to legislative restriction, and such is believed to be the case in homestead laws generally. If the Constitution gave the "head of the family" a fee simple absolute, the Legislature could not deprive him of it.

To arrive at the true interpretation of Section 32 of Article II of the Constitution, it may be proper to inquire:

1st. What was the general view of the character of homestead rights at the time of its adoption.

2d. What was the contemporary construction of the Section in question.

It is a general rule that Constitutions are to be construed in the light of the common law, but, as the common law has no interest or estate analagous to this, and as the whole system is of very recent

origin, and confined to the United States, our inquiry is limited to the consideration of similar provisions in the different States of the Union. Professor Washburn, in his Treatise on Real Property, says: " The right of homestead partakes more nearly of the character of an *estate for life* than any other, and is treated of as coming within that category; indeed, in some of the States it comes properly within that class of estates."—Vol. 1, p. 325.

" A homestead, in law, means a home place, or place of the home, and is designed as a shelter of the homestead roof, and not as a mere investment in real estate, or the rents and profits derived therefrom."—Ibid, 326.

Twenty-five States have adopted homestead laws; nine of them by provisions in their Constitutions, the remainder by legislative enactment. Of all these, we have had facility for examining thoroughly the laws of fourteen only, and we find that, either by constitutional or legislative enactments, or by judicial decisions, it has been determined that the right of homestead shall terminate with the death of the head of the family, or minority of the youngest child. This in the States of Illinois, Maine, Massachusetts, Michigan, Minnesota, New Hampshire, New York, North Carolina, Ohio, Pennsylvania, Vermont, Virginia, and West Virginia.

It seems that in Iowa the homestead descends to the proper heirs of the estate, but the precise provisions of the law there we have not been able to ascertain. As to the other States, we have not been able to make any investigations which would enable us to speak with accuracy, but the general, we might almost say universal, current of law and authority is, that the estate of homestead is not an absolute estate in land, but something coming out of the general property in the land. This is consistent with the general policy under which these laws have been instituted—to secure to the householder a shelter for his family—that his children may not be turned out into the world by a stroke of unmerited misfortune, at an age when they are too tender to buffet with it. With the death of the head of the family, and the coming of age of the youngest child, this humane object has' been accomplished; the children are then to seek homes of their own—society has done its work.

When it is considered that this was the general understanding of the meaning of homestead exemptions at the time of the adoption of the Constitution, and that the words clearly import that the ex-

emption is not to the debtor himself, merely as a citizen, but as "head of a family," there should be no doubt as to the intention of the framers.

2d. This view is strengthened by the fact that such was the contemporary interpretation. It is a matter of history that the General Assembly of 1868, upon which the Constitution devolved the duty of enforcing the provision, was composed, for the most part, of men who were members of the Constitutional Convention. It is to be presumed that they knew their own minds. Who, better than the makers, can tell us what their intentions were? While contemporary construction should have but little weight in cases where there is no ambiguity, and should never be allowed to abrogate the text, or fritter away its obvious sense, yet, when this construction is not unreasonable, is in accord with the general sentiment of mankind and the weight of authority, and comes from men who had all opportunity to know the real intention, and were bound by their official votes to enforce the provisions of the Constitution in letter and spirit, when this construction took the form of a solemn enactment, and has been acquiesced in by the Courts, and rights have accrued in reliance upon it, which should be divested by a decision that this construction was erroneous, the argument ought to have great weight.

The Supreme Court of the United States has frequently been governed in its decisions by such considerations.—*Stewart* vs. *Laird*, 1 Cranch., 299; *Martin* vs. *Hunter's Lessee*, 1 Wheat., 351; *Cohens* vs. *Virginia*, 6 Wheaton, 418, where Chief Justice Marshall says, "great weight has always been attached, and very rightly attached, to contemporaneous exposition;" *Bank of United States* vs. *Halstead*, 10 Wheat., 63; *Ogden* vs. *Saunders*, 12 Wheat., 290, where Mr. Justice Johnson assigns the reason: "It proceeds upon the presumption that the contemporaries of the Constitution have claims to our deference, because they had the best opportunities of informing themselves of the understanding of the framers of the Constitution."

Some later cases—notably *Brigham* vs. *Miller*, 17 Ohio, 446, and *Johnson* vs. *Joliet and Chicago R. R. Co.*, 23 Illinois, 207—have pushed the doctrine much farther, and have sustained legislative action, which they have held to be usurpation, on the ground of acquiescence and of rights acquired under it.

It is enough for our case that we should raise a doubt, for the Court should be bound by the doubt to refrain from acting; and

this suggests some consideration of the limits of judicial power, and the principles which control its exercise in cases of this nature.

The Constitution has expressly made it the duty of the General Assembly, at their first session, to enforce the provisions of this Section by "suitable legislation." It is clear, then, that the Constitution was not to act *proprio vigore*, and that the Legislature, and not the Courts, is to determine the "suitable legislation;" the Legislature, and not the Courts, then, is to interpret the meaning of this provision; for how "enforce" it without determining first what was to be enforced? The General Assembly, then, was clearly within the scope of its legitimate powers in passing the Act of 1868. But suppose the facts were as the defendants claim, what remedy could this Court apply? To declare an Act of the Legislature illegal, because in excess of the powers conferred by the Constitution, is one thing; but that the Court, in order to effect the supposed intention of the Constitution, shall extend the Act of 1868 farther than the Legislature has done, is a totally different question.

Even if the Court were convinced that it was the intention of the Constitution to grant an absolute estate, and were satisfied of the wisdom and expediency of such grant, it could not exercise any such power. "Although the Legislature may have omitted to do what the Constitution enjoined upon them, this is a matter with which the Court can have no concern."— *Graves* vs. *Slaughter*, 15 Peters, 502.

Now, if the Court cannot supply the place of the Legislature, when that body has entirely failed to enforce the Constitution, *a fortiori*, when the Legislature has taken jurisdiction of the subject, and enacted what it regards as suitable legislation, the Court cannot extend that Act one step beyond the limit which the General Assembly has prescribed. What is said by Judge Cooley is apposite: "The remedy for unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the .people. If this fail, the people, in their sovereign capacity, can correct the evil, but the Courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason and expediency with the law-making power."—Con. Lim., 168.

Courts are not at liberty to inquire into the proper exercise of power by the Legislature, in a case where the latter have been

acting within their constitutional limits. In the performance of any duty within those limits, their acts are valid and conclusively binding. They are a co-ordinate department of the government, and their opinions, on questions of natural right or expediency, are not subordinate to the judicial will.

If they violate the fundamental law, by legislating upon matters over which they have no authority, then the Courts may determine the validity or invalidity of their acts; but "Courts have no right whatever to set aside, to arrest, or to nullify a law passed in relation to a subject within the scope of the legislative authority, on the ground that it conflicts with their notions of natural right, abstract justice or sound morality."—Sedgwick on Stat. and Constitutional Law, 187.

They have no right to supply what they may conceive to be the defects of the Constitution—to fill up every *casus omissus*—or to interpolate into it whatever, in their opinion, ought to have been put there by its framers. "I cannot bring myself to approve of the power of Courts to annul any law solemnly passed, from a broad, loose and vague interpretation of a constitutional provision, beyond its natural and obvious sense," says Senator Verplanck, in *Cochran* vs. *Van Surley*, 20 Wend., 381.

If the subject-matter of the Act, the manner in which its object is to be accomplished, and the mode of enacting it, is within the constitutional limits, the Court cannot inquire into the proper exercise of the power. They must assume that the legislative discretion has been properly exercised.—*People* vs. *N. Y. Cen. R. R. Co.*, 34 Barb., 137; Cooley, Con. Lim., 186; 36 Barb., 193.

"A legislative Act is not to be declared void upon a mere conflict of interpretation between the legislative and the judicial power. Before proceeding to annul, by judicial sentence, what has been enacted by the law-making power, *it should clearly appear that the Act cannot be supported by any reasonable intendment or allowable presumption.—People* vs. *Supervisors of Orange*, 17 N. Y., 241.

There is another rule which should govern Courts in cases of this nature. They should never assume that the framers of the Constitution, any more than the General Assembly, would enact any law in contravention of the Constitution of the United States, which, in Section 4 of Article I, they declare to be paramount; and if it is possible to give legislation such construction as will not put it in conflict with that instrument, it is their duty so to do.

Now, the Constitution of the United States, Article I, Section 10, prohibits the States from passing any laws impairing the obligation of contracts. The homestead provisions, as interpreted by the Act of 1868, might possibly be sustained, as not being repugnant to the Constitution, on the ground that they do not deprive the creditor of his remedy, but only *postpone* it; and some great Judges have holden that to vary the remedy does not impair the obligation of the contract.—Marshall, C. J., and Duvall and Story, in *Ogden* vs. *Saunders*. But if the construction contended for by the defendants is correct, the remedy is not simply postponed, but is taken away altogether, and no Court could hold that this is not in contravention of the Constitution of the United States, and, therefore, void.

Authorities might be multiplied upon this point, but it is sufficient to refer to the late case of *Gunn* vs. *Barry*, decided by the Supreme Court of the United States, in a case involving the homestead laws of the State of Georgia.

Lastly, it is submitted that whatever may be the true interpretation of Section 32 of Article III of the Constitution of this State, this plaintiff having purchased the interest of James Younge in the lands in question, under legal process issuing upon a judgment obtained and a debt contracted prior to the adoption of the Constitution, is to be considered as entitled to the possession of said lands, the claims of the defendant to the contrary notwithstanding, said claims being wholly founded upon the said Section and Article of the Constitution of this State, and the laws passed in pursuance thereof, which Constitution, and which laws, so far as they relate to, or are intended to apply to, contracts made before their adoption, are wholly inoperative, and can have no binding effect, inasmuch as the same are in contravention of Section 10, Article I, of the Constitution of the United States.

*Vide* Constitution of South Carolina, Article I, Section 4; Constitution of the United States, Article I, Section 10; Article III, Section 2; *Gunn* vs. *Barry*, 15 Wallace, 610.

*McLure & McLure, Brice,* contra:

I. The estate of homestead in lands is an estate unknown to the common law; it is, with us, a creation entirely of the organic law of the State, and its character and extent can be determined only by reference to the special provisions of the Constitution creating it.

Section 20 of Article I of the Constitution declares that "a reasonable amount of property, as a homestead, shall be *exempted from seizure* or *sale*, for the payment of any debts or liabilities, except for the payment of such obligations as are provided for in this Constitution;" and Section 32 of Article II of the Constitution declares that the family homestead of the head of each family, &c., shall be *exempt from attachment, levy or sale, &c.*

The language here used, "*shall be exempted,*" "*shall be exempt from attachment, levy or sale,*" is positive, explicit and unqualified in its terms, and indicates clearly that it was the purpose and intention of the framers of the Constitution to vest in the heads of families, and for the benefit of families, an absolute and unlimited estate in the homestead.

These Sections of the Constitution are to be so interpreted as that the object and intention of the framers shall prevail ; and the words used are to be construed according to their popular or generally received import.—1st Kent, 510, 511 ; Potter's Dwarris on Statutes, 175–183, 193–203.

They are also in the nature of remedial or beneficial statutes, and are to be construed liberally.—Potter's Dwarris on Statutes, 231–239.

Feb. 18, 1874. The opinion of the Court was delivered by

WILLARD, A. J. The Circuit Judge having dismissed the complaint on complaint and answer alone, it is necessary for us to consider whether, upon the facts stated by the complaint, the plaintiff is entitled to the relief demanded by him, or to any relief whatever.

The plaintiff claims to be the owner in fee of certain lands in the possession of the defendants. His title, as alleged, was derived as purchaser at a Sheriff's sale under a judgment recovered in 1859 against James Younge. Margaret, the widow of the deceased judgment debtor, obtained the assignment of a homestead in the premises in controversy on the 25th of October, 1869. She died in 1872. The defendant, Agnes, the wife of J. S. Carroll, the minor child of James and Margaret Younge, is now in the enjoyment of the homestead. In January, 1872, after the assignment of the homestead, the premises covered by the homestead exemption was sold at Sheriff's sale, subject to the right of homestead, and purchased by the plaintiff. He alleges that defendants are com-

mitting waste by the destruction of the timber, and the answer does not deny such waste.

The judgment dismissing the complaint appears to have been based upon a determination that the right acquired under the assignment of the homestead, and now held by the defendants, was in the nature of a fee simple, and that, accordingly, waste could not be alleged.

At the close of the appellant's argument a question appears to be discussed affecting the validity of the proceedings for the assignment of the homestead, on the ground that such assignment was in violation of the rights secured by the judgment, and tended to impair the obligation of the contract enforced by such judgment. That question cannot be made at the present time. If the assignment of the homestead was, for any reason, in violation of plaintiff's rights, advantage should have been taken of such fact in a direct proceeding; it cannot be considered collaterally as sought by the plaintiff in a suit to stay waste. The plaintiff's case is placed by him upon a purchase made subject to the homestead right, and, doubtless, at a price based on the assumption of the validity of the homestead claim, and, accordingly, he does not occupy a position enabling him to open the question of the validity of the original assignment.

The first question that is presented is, whether the plaintiff shows in himself an estate or interest in the lands of such a nature as to entitle him to restrain waste on the part of the defendants. His whole claim depends upon the validity of the Sheriff's sale, under the judgment, of the premises subject to the homestead. The defendants claim to hold the premises in the right of the defendant, Agnes, as an estate in fee simple. On the other hand, the plaintiff claims to have acquired the fee under the Sheriff's sale.

The question then arises, did the fee of the lands pass to plaintiff under the Sheriff's sale? If not, are defendants in a position to allege against the effect claimed for such Sheriff's sale?

At the time of the sale of the premises in question they were subject to a right of homestead which we must assume to have been rightfully assigned. The Constitution declares that such homestead "shall be exempt from attachment, levy or sale on any mesne or final process issued from any Court." It is clear that this language distinctly forbids such execution of final process as that under which the plaintiff claims. It is equally clear that, as the plaintiff claims

through the operation of the law above, and not from any act of the parties, he can only take that which the law confers on him in virtue of the validity of his proceedings. Now as the Constitution is a part of the law governing the force and effect of the process of the Courts, it follows that that which the Constitution forbids cannot be effectually attained through the abuse of the process of the Courts. Unless, then, there is something in the proposition, that although the land could not be sold, yet a remainder over after the expiration of the homestead right could be sold, the plaintiff altogether fails to show such title in himself as he alleges as the foundation of his demand for relief.

We must, then, inquire whether enforcing a judgment against premises in respect of which a homestead right is properly secured, by way of selling a remainder therein, to vest in possession after the termination of the right of homestead, is conformable to the Constitution.

If the Constitution, in using the term "exemption," means absolute exemption, then it is clear that the attempt to sell such a remainder was a violation of its terms.

In order to hold that a limited exemption only was intended, such as would admit of stripping the judgment debtor of title, while leaving him a limited right of possession alone, it would be necessary to find either language in the Constitution importing such limitation, or something in the declared policy of the enactment rendering such a construction proper. Nothing of this kind appears in the Constitution, or can be made out on the principles of construction. The object of the Constitution was, clearly, to perpetuate in the judgment debtor or his family, under certain conditions, the ownership as well as the use of the family homestead. We are not justified in diminishing the force and effect of the word "exempt" as it stands in the Constitution.

The plaintiff has not made out a title in himself that authorizes an injunction to stay waste.

It is not necessary, then, for us to consider what was the nature of the interest remaining in the judgment debtor and his family under the operation of the homestead laws, for the plaintiff does not put himself in a proper position to question the nature of the defendants' right of possession.

The appeal should be dismissed.

*Moses,* C. J., and *Wright,* A. J., concurred.